Insurance Company at all. Numbers are 09-1297 and 1298. Mr. Martin and Mr. Gottlieb and also Mr. Donovan. Welcome. Good morning, Your Honors. May it please the Court, James Martin, for the Liberian Commissioner of Insurance. With the Court's permission, I'd like to reserve three minutes of my time for rebuttal. Oh, that's fine. If you'd move just a touch closer to the microphone. And is the set on? Great, thank you. As the Court knows that there are two principal issues in this case. Can we just work on some facts at the outset? Certainly. Because we've seen a flow of letters back and forth. Mr. Sanessy has resigned or no longer the Commissioner of Insurance, is that correct? That's correct. And he's been replaced and you are still representing Mr. Sanessy, however? Correct. He's still in this proceeding and involved in it. He's the subject of the order below. He was entitled to immunity at the time the order was entered. He's entitled to immunity now and there's no jurisdiction over him. As we've suggested in our letter to the Court, that makes this a live controversy as to Mr. Sanessy. In addition, certainly with the official capacity having changed, the dispute is going to go on. It's capable of recurring and consequently there are probably two recognized exceptions to the mootness doctrine at work here. The first, I mean, just last week we had the four arguments in the Fourth Circuit case that went up to the Supreme Court. Right. Yousef case, or Sumantra. And just looking at the transcript of what it's worth or not worth relating to that case, I mean, it looks like the Court really is struggling to what extent, I mean, a host of issues. To what extent does the FSIA preempt the field with regard to what the Executive used to do with the State Department? You know, do you take words literally or you have one Justice on the Court who, you know, often adheres closely to the text saying, well, it may not apply here because the FSIA doesn't necessarily deal with individuals, and yet you've got six circuits going one way and two going the other. Let me say a couple words on Yousef first. It's clear from that argument that all the counsel received very vigorous questions. It seemed to me there was a consensus or at least a concern that if the Act did not apply to individuals, there were going to be problems with what Congress intended under the FSIA. And even the textualists on the Court seemed to suggest that that was a real issue. There also is room in the statute to include individuals either either under the definition of foreign state or under the agency and instrumentality prong, although that didn't seem to get much traction. But the Chayudin case from the Ninth Circuit, to me, is the roadmap for how that would be accomplished. And certainly from your Your Honor, I agree. We should wait for the Supreme Court to speak and a further briefing is warranted on the individual issue in light of that. I think we should do it within the confines of 28J or otherwise. I would only add that the former immunity question is not present in this controversy. Even under the most restrictive construction of the immunity, it applies at the time the lawsuit is filed. And so Commissioner Sinense had immunity at the time the lawsuit was filed. He's got it now. So if the Court's prepared to entertain the controversy as to him, which I think it should, there's no debate about former capacity on the immunity question. As the Court knows, the other prong of the FSIA that's at work here is the commercial activity exception. There's a two sentence or single sentence, excuse me, legal conclusion in the order below that the commercial activity exception applies. But frankly, Your Honors, that's not supported by the record. And this Court should reject that determination. There is, in fact... But why would the record not support a conclusion that Sinense was simply enforcing a contract right in the Cayman Islands suit? Well, we've cited four or five cases, Your Honor, including the Granville case, most notably, that indicates that when you look at the source of the receiver's power, that you get down to this liquidation and winding up function in an official capacity, acting as a sovereign function. And the Courts have made it clear that that has no parallel to private activity in enforcing a contract. What it is, is a sovereign function for the benefit of individual claimants. And as the Courts have remarked, including most recently, as I said, in the Granville case, the way the receiver acts, the way they go about it, what they get to do, and what they're empowered to do, is more like a regulator or liquidator ending the market. They don't enter the market as a private party. And in fact, this is not private activity as the Courts have said in any common sense of the word. It also departs from the cases that are cited against us, Your Honor, because those cases really are nations or individuals acting as a private party would in enforcing a loan or being subject to contracting problems. That's not the issue with the Commissioner here. Apart from that, of course, Your Honors, we have the direct effect issue. Again, this is a single-sentence finding in the order and not supported by any factual evidence. And there is no direct effect from this lawsuit in this state under any fair characterization of the law that has dealt with direct effects. This lawsuit in the Cayman Islands filed under the receiver's public authority and under his official authority is against ACE. ACE is not in the United States. ACE is responsible for the judgment. So whatever financial effect or consequences there are from this judgment or this proceeding are going to be felt overseas and outside the United States. And there's no case that's been cited to the Court that applies the direct effect exception in those circumstances. The only other direct effects that have been suggested here. I mean, the problem – you've got, I counted, I guess, six different proceedings. The very first one filed way back when, back in the early 90s, essentially talks about what can be – let's see if I have the first one here. It is the – whether the political turbulence in Liberia rose to the level of insurrection as defined in the war risk exclusion. And the jury found for the plaintiffs that the district court entered a judgment NOV. Then – so in one sense, it looks as if what there is is an attempt to go around that. You could make that argument. From your perspective, you've got an administrative individual who's trying to carry out Liberian insurance law with respect to activities of SIGNA or SIGNA's entity that looks like it didn't comply with Liberian law. And the question is, when – what do we do? And obviously, we talked about the first part of it, does the FSIA apply to individuals to give them some protection in the right circumstances? And then after that, we look to – you talked about commercial activity, direct effects and whatnot. But is there any room here for courts to ask the State Department for any type of – that the person was – should be left alone? Is that done at any point by courts? Or do they basically do what the Eastern District of New York did? Only if the FSIA immunity falls away. Then there should be consideration of common law immunity as to the commissioner or anyone acting in the capacity of the commissioner. And as far as I can tell from the briefing in the USAF case and the Fourth District's remand or circuits, excuse me, that is done. But let me frame the question a little more narrowly here. We're not talking about courts not being able to enforce orders or the protection of injunctive relief or anything like that. We're urging a very narrow point, and it goes something like this, that that court order can't extend to abrogate the immunity if it applies, or the court order here can't extend to confer jurisdiction if impersonum jurisdiction isn't present. Those are the two very narrow questions posed by the proceedings below. And on both of them – Right. And just to clarify, and I'm sure this is a very obvious point, but I will admit as someone who's been essentially a country lawyer and a country judge most of his life, this is the first time I've confronted the FSIA. Right. We don't have to reach the personal jurisdiction issue if you prevail on the commercial exception issue here. That's correct. Now, you said a little while ago, you briefly argued why this was not commercial activity. And, of course, if you prevail on that, we don't have to reach the direct effects issue either. That's correct. But I found your suggestion that there are no direct effects here somewhat less strong than your arguments with respect to no commercial activity. I mean, my gosh, what we have here is the simple fact of a violation of an anti-suit injunction. How is that not a direct effect? Your Honor, we have to focus on, first of all, the sequencing of all of this and how it came about. It's an anti-enforcement injunction, not an anti-suit injunction, because we had the Liberian judgment, or I should say that AJA did, before that. The second thing we have to look at is what is the exception really talking about. And it is consequences in the jurisdiction that are the immediate result of the act in question. Now, the act in question here is the enforcement of a valid claim presented to the receiver consistent with Liberian law. And the question is, will that have any effect in Pennsylvania? I've said as to Ace, the defendant in the case, no. As to the court order, the effect is just as attenuated because the impact of the order at the end of the day will not be on the defendant that is in this jurisdiction. The effect does not have to be, pursuant to the language of the statute, simply visited upon Ace, right? Right. It's broader than that. It is, but that effect is too attenuated once you work it through that it won't have any direct consequence in this jurisdiction. The terms of the anti-enforcement order don't run against the receiver in an action against Ace. So you don't have the kind of direct and immediate effect that the FSIA intends. That said, of course, that is what drives the impersonum jurisdiction analysis as well. I see I'm at the end of my time. Keep going. The point of the impersonum jurisdiction analysis is that there is no presence by Commissioner Sensei in this jurisdiction. He filed a lawsuit overseas against another defendant who is not connected to the U.S. without any purposeful effect on Pennsylvania at all. He had the right to do it under Liberian law. It was part of his mandate under Liberian law. And as a result of that – But in effect what he's doing is purportedly there is a contractual obligation that Cigna undertook with regard to Liberian law. There's a claim that it violated that contractual obligation. And he's now attempting via a suit in the Cayman Islands to enforce that contractual obligation. Why is that not commercial activity? It's slightly different than that, Your Honor. And this also goes to Judge Smith's question on why the intersection with the anti-enforcement order is not as direct as we might think. The reason that Cigna was the subject of proceedings in the receivership in Liberia is not sourced in a contract right at all. Cigna was the subject of receivership proceedings in Liberia because it chose to do business there and then violated Liberian insurance law when it took its business away. It was that act that created the receivership. The claims that were presented to the receiver that were judicially approved and are being pursued in the Cayman Islands are sourced in the approval of the claims process that exists under Liberian law for the receiver. If there were to be a judgment against Cigna in the Cayman Islands, would the party, AJA, that brought the first suit share in the recovery? Let me wordsmith that a little. If there was a judgment against Ace in the Cayman Islands, Cigna is not in the Cayman Islands. And that's a distinction with a very meaningful difference. Second, Ace is the one that has the financial responsibility for paying those claims. And the direct answer to your question is I do not know how the commissioner would distribute the money received to the claimants. That hasn't been adjudicated yet or decided. I do say that AJA's claim is one of the approved claims that is in the Cayman proceeding. One, just almost to finish where we started, you say that you're still representing Mr. Sonesse. Do you represent or has your firm been asked to represent his successor, Mr. Sonesse? We do represent the Liberian Commissioner of Insurance as well and are continuing and will continue to do so in these proceedings. So, yes, the answer to that is yes. Thank you. Mark Gottlieb, thank you very much. Good morning. May it please the Court, my name is Mark Gottlieb. I represent Mr. Lohman, who is an attorney and is counsel along with other counsel to the receiver in this matter. This seems to be a more difficult case from your perspective for your client because he is a U.S. citizen, he's admitted to the bar in a state, and he's representing his client in his capacity as a lawyer for the purpose of getting a fee. Why isn't that commercial? Well, let's back up, if I may, and that's in terms of the immunity issue itself. I realize that the Yousef case will decide whether the FSIA applies to individuals. And that's what I was going to say. And I also was simply going to make the point that as a U.S. citizen, the exception would not apply if the foreign state under 1603A was the analysis that the Supreme Court utilizes, so immunity would be available to him. In terms of it not being commercial activity, Mr. Lohman was retained by the receiver pursuant to the court order of Liberia and is a team of lawyers simply on the staff of the receiver. The record reflects that he was not admitted to practicing Cayman and has no direct control over the actual litigation in the Cayman Islands. However, he is counsel to the receiver. I would suggest that that does not qualify as an exception when you consider the nature of his activity, but rather as simply practicing as an attorney on the receivership. How do you distinguish the Houma case, which appears, you know, says in effect that he is a U.S. citizen, is subject to suit, not immune? I think that the Houma case, Your Honor, and this really goes to Judge Spitz's question as well. First of all, the underpinnings of Houma make clear that the fundamental issue of whether or not someone reasonably anticipates being hailed into the jurisdiction is the sort of the foundation of the super contact theory. It's not a novel theory in and of itself when viewing jurisdiction in that context. It's also, though, a theory that the Third Circuit has not previously adopted. No, that's correct. And what I'm suggesting, frankly, is that I don't think it's a difficult concept to embrace in and of itself. What I am suggesting, however, that the manner in which our opponent is suggesting that it be applied, which is that an order of the court is applied across the ocean universally without any regard to the facts, is stretching the bounds of due process and does not comport with our sense and our understanding of jurisdiction. In the Houma case, you had assets which were taken and there was a receiver appointed, which ironically enough is not unlike in Liberia where Cigna, who chose to submit to the jurisdiction of that particular country, pulled its assets out of Liberia, which caused the receivership in 2007 to be. Has any court so far held that a sovereign attorney is immune under the FSIA? No. And we referenced the two cases that actually exist, which are not in our favor in terms of a U.S. citizen. But what I'm suggesting is that that particular analysis really is going to, I would suggest, stand or fall on the Supreme Court's resolution of the Yousef case. But going back to Houma for a moment, the bank in the Dominican, which was. I'm not sure. We don't know how far Yousef will go. That's correct. To say that Yousef follows the majority rule and says that individuals are eligible for coverage under the FSIA, there's still other issues that have to be dealt with. That's correct. And the two issues as it applies to Mr. Lohman would be whether the commercial activity exception applies and also whether or not there is direct impact on the United States, in particular this jurisdiction. And thirdly, whether or not as a U.S. citizen he enjoys any, there is an exception. And what we are suggesting in our brief is that unlike the cases which were decided, when you have counsel for the sovereign acting in his capacity as an attorney, this is not like the driver of a bread truck. This is someone who is one and the same as the receiver himself. And under those circumstances should enjoy. Pursuant to an agency theory? Pursuant to an agency theory, yes. In fact, that's the only theory. That's correct. And should enjoy the same immunity that the sovereign enjoys himself. And if I may just simply go back to Houma for a minute because you did ask me about it, and that is that in the Houma case, the court specifically found that the assets, which were in the Dominican Republic, I believe, or in the Caribbean, were essentially the assets which were part and parcel of the conspiracy to launder money out of that jurisdiction. It would come as no surprise to the individuals who were contemptuous of the court in that case, as well as Waffenschmidt, that they should be hailed back into court where the assets, which were the subject of a freeze order, tangible assets, which were the subject of a freeze order, were removed from that jurisdiction. Whereas in our matter, there is absolutely no direct effect on this jurisdiction. And the record reflects that when Mr. Lohmann first contacted counsel for Cigna in 2006 and informed them of the demand, the response from Cigna was not, you are in contempt of court. The response of Cigna on two separate occasions in 2006 was, well, reasonable people can differ. Now, if our opponent did not reasonably anticipate that Mr. Lohmann, when he was actually representing a party, would be hailed into the Eastern District, then surely once he is appointed as counsel to the receiver involving an action, which is on behalf of the country of Liberia, having to do with assets of ACE, having no assets whatsoever in this jurisdiction, then the only, quote, connection, the only connection between this jurisdiction and this case is this order. With no, a naked order with no effect. And I would suggest that under the circumstances of these facts in this matter, that Mr. Lohmann would not reasonably anticipate being hailed into this jurisdiction and would not comport with a sense of justice, particularly given the record in this matter. Thank you very much. We'll hear from Mr. Donovan. May it please the Court, my name is Donald Donovan and I represent Cigna Worldwide. I'll start off by asking you the same question. Do you think we need to hold this matter in abeyance pending the Supreme Court's decision in USA? Well, I think you can affirm without deciding that question, Justice, that you can hold the same grounds that the District Court did and affirm his rulings both on the Foreign Sovereign Immunities Act and personal jurisdiction and you won't have to reach it. If you were to have to reach it, it would make sense to await the Supreme Court. We have no objections to that. We would merely note there was a reference here at the podium to common law immunity with respect to any suggestion that this common law immunity, we would contend that that has been long since waived on the part of these appellants. But again, with the Court's permission, I'd like to use my time to focus on three issues. Those are commercial activity, direct effects, and personal jurisdiction because we believe that the District Judge, Judge Fulham, should be affirmed on those three issues and then there were other issues that you would not need to reach. We reserve with respect to the appellate jurisdiction point and we also reserve with respect to whether or not a sovereign should even get through process. We've briefed that. We're prepared to rest on our briefs on those points. So with the Court's permission. Speaking only for myself, I do not find commercial, non-commercial distinction to be a particularly easy one to draw. Help me please with any kinds of definitional guidelines that might aid us in determining what is commercial and non-commercial. Sonesse sues Ace in the Cayman Islands. He sought indemnification based on a contract between Ace and CWW. That sounds commercial. Sonesse sues Ace in the Cayman Islands as a court-appointed receiver of CWW. That sounds more non-commercial. Your Honor, I could refer you to the test that the Supreme Court gave you. In fact, it's very straightforward. That's a good place to start. Yeah, that's where we all usually start. And what the Supreme Court has said is it has two very simple inquiries. First, you figure out what is the gravamen of the complaint? What is the action on which the claimant, the plaintiff, brings the suit? What's the nature of the action, right? Well, first you've got to identify what it is that you're going to assess the nature of. And what you want to assess the nature of here is the contemptuous acts on which we have sought contempt is Mr. Sonesse's filing of a suit in the name of CWW against Ace in the Cayman Islands. Sonesse, I mean, this case had a long and tortured history before Sonesse ever even came on the scene, correct? Well, actually, we wouldn't agree that it's long and tortured. And I think it's useful. Judge, you've just gone back to the basics. I think it is useful. We're dealing with a bunch of legal maneuvers here. Foreign investors coming in, buying claims, appointment of receiver. But in this case, yourself and Sonesse's shoes. He's in Liberia. He's the commissioner of insurance. There's a strong claim that the tenants of the insurance law in Liberia had been violated by Cigna. And he's basically mandated by law to go out and do something about it. You can't let people do that. So he goes out and he does something about it. And now they're saying, not in the Cayman Islands, but in the eastern district of Pennsylvania, he's subject to being held into court. Why does the FSIA, assuming it applies to individuals, not protect him? Well, first of all, we don't think there's a strong claim that Cigna's violated Liberian law. We just think that's all irrelevant. We don't concede the point. Assume it for the moment that there is a claim, forget the word adjective strong, that there is a viable claim, a plausible claim that they violated Liberian law. I mean, at one point you showed up and you decided ultimately not to participate, and I can understand that. But the claim exists. Well, and I will address the court's question. But, again, this supposed need to comply with Liberian law was a voluntary act on his part after there's evidence in the record that these claims were purchased by foreign investors. I mean, yeah, it's a voluntary act. But if you don't do it, you're going to get replaced. Well, we would contest that. But let's assume it. The court has asked me to assume it, and I will assume it. What you have here is a situation. The fact that he is an official of a foreign government has nothing to do with the FSIA analysis. That's the starting point. What the Supreme Court has said is you look at what the action is. And what the action here is Mr. Sanessy purporting to be CWW and in that capacity doing two things. That's what we're seeking contempt on. In connection with the suit in the Caymans, he is purporting to recognize a Liberian judgment that conflicts with a U.S. judgment which the underlying claimant, AJA, came to this district to secure, voluntarily came, litigated for four or five years, resulted in a judgment by Judge O'Neill. This court affirmed that judgment. Did you say that the fact that Sanessy is the chief insurance regulator of Liberia has nothing to do with the analysis? Your Honor, what I should have said is it's the starting point of the analysis. You did, I think, say that next. And forgive me if I spoke imprecisely. But when you're talking about the FSIA, you're always talking about a public official. The question is, to get back to the Supreme Court's teaching, first, what's the action? The action is in the face of a judgment that Judge O'Neill rendered in 1995 that this court affirmed that the Supreme Court denied cert on. The AJA, the underlying claimant, goes to Liberia and gets a conflicting judgment. CWW comes back to Judge O'Neill. Judge O'Neill issues a very careful opinion in which, by the way, he very carefully assesses comedy concerns, looks at the restatement, and says, this is duplicative and vexatious, and I'm going to enter an anti-suit injunction about it. Now, we are here to enforce that anti-suit injunction. The claim is that the FSIA protects Mr. Sinese. What does the Supreme Court tell us to do? The Supreme Court tells us to identify the gravamen of the claim. As I've just said, the gravamen of our claim is that Mr. Sinese, acting as CWW, has purported to recognize the conflicting Liberian judgment rather than the U.S. judgment. And secondly, he pretending to be, or purporting to be, acting on behalf of CWW, he is suing Ace and the Kamens. This is what the proposition reduces to, Your Honors. Mr. Sinese is in front of this podium saying, what's the test? The Supreme Court test is, this is going back to your original question, Mr. Smith, excuse me, Judge Smith, how do we know that it's commercial? The Supreme Court has said very clearly, you know it's commercial if a private party can do it. How do we know this is commercial? How do we know this has to be commercial? We know it has to be commercial because Mr. Sinese has to purport to act as CWW in order to do it. He's standing at this podium saying. What if you, does the State Department, post-1976, does it have any role whatsoever in making suggestions of immunity? Of course, the purpose of the FSIA was. Do they have any role post-1976? The role that they assert is in connection with individuals, as the Court knows from having read the transcripts and presumably following the suit, the United States has taken the position since all the way back to Chuadon, that individuals are subject to common law immunity that the FSIA did not displace. And that with respect to individuals, common law immunity would be determined in the first instance by the State Department, and a court would determine only if the State Department does not put in a statement of interest. In other words, maintaining pre-FSIA the regime. Post-FSIA with respect to sovereigns, there's a possibility, of course, that the State Department could, and sometimes does at the behest of foreign governments, put in a statement of interest or express a view. It certainly has the discretion to do that, as it can come in on amicus on any issue in the federal courts, but my understanding is that it rarely does that. There's no suggestion that it has any inclination to do it here. I keep asking myself, if they came in and looked at this and analyzed it, I would lay a bet that they would come in and say that there's a statement of interest with respect to senescence. Your Honor, again, if you apply the most basic principles of the Supreme Court, respectfully suggest that can't be. Well, the basic principles of the Supreme Court, we'll find out probably in June. Well, I'm sorry, with respect to on the individual immunity point, whether an individual can be subject to immunity. Well, the State Department, as you say, has taken that he may be subject to immunity, but the subject that he is, on the subject of whether he's immune would be a separate question, and they've taken a position, and that can go up and down. I would respectfully suggest that they would find this crystal clear. Because if they're coming, first of all, if you apply the Supreme Court's teaching, you determine whether or not a private party can do it. And here, by definition, a private party can both recognize a judgment based on a contract and can bring a contract claim. Mr. Senezi makes two arguments to avoid that result. He says he's acting as a Liberian insurance commissioner. He says that he's acting on behalf of the Liberian people. He says that he's acting in the context of a statutory scheme. Which is exactly what an insurance commissioner would say, whether it's in Delaware or Liberia. But the FSIA says that's entirely irrelevant. The FSIA expressly says the purpose for which he's doing an act doesn't matter. In the Weltover case involving Argentine bonds, the Argentina wasn't issuing those bonds in order to make money or to speculate on the stock exchange. What is that purpose and not merely the position or role that he has? What makes that purpose? It really comes back to Judge Smith's question. You were asked to write an opinion talking about when something is commercial activity and when it is not. And some of the metrics that we've used with regard to that don't seem to fit real well. So how would you go about advising us to do something that makes sure that we're as precise as possible and maybe we need to clarify some of the language that we've used in the past or courts have used in the past? If I were writing an opinion, I would say the guidance from the Supreme Court is crystal clear. You determine what are the acts on which the claim is brought. Our claim is brought on the notion of Mr. Sinesi recognizing a claim arising from a judgment on a contract and in that context stepping into the shoes of a private party and another context stepping into the shoes of a private party and bringing a suit on a contract. Entering into a contract is the quintessential commercial activity. Bringing a suit on a contract, as the Intel decision that we cited suggests, is just as commercial because you're trying to enforce commercial rights. That is what Mr. Sinesi is doing here. It's by definition commercial activity. Why isn't this like the Reebok case? Well, the Reebok, it's different. That, of course, goes to personal jurisdiction. You're absolutely right. You're right. But I'm happy to address that. With respect to the Reebok case, it can't, again, it's fundamentally different. We'll come to that later. Would you rather I address it? We can come to that later. Okay. Well, then, again, I want to address the two arguments. The first is I've suggested that whether or not you talk about the old The answer to the question, what you said was, in terms of the guidelines you would give, is that if you are having an individual, a government individual, who's attempting to enforce a private contract with the government, that is quintessentially commercial? Is that what you're saying? That's a commercial act. A private party, we know that a private party can act in the same fashion, can do the same thing, because he's pretending to be the private party. So when is this individual acting in his government capacity such that it is more administrative slash governmental as opposed to commercial? Well, that's exactly the relevance of the Drexel and Granville cases, which was the next point I wanted to get to. In those cases, and they make the – Granville doesn't help you much, does it? It doesn't hurt us at all, either, because in those cases, in both of those cases, the language is very clear in Drexel. It's also reasonably clear in Granville. But what's happening is crystal clear. In both of those cases – If this was so crystal clear, I'm not sure we'd be here today. Well, I think what happened in the cases is clear. In Drexel, the claimants sued the receiver because complaining of – and the court said the essential claim was an adverse determination in a claims resolution process. And Judge Newman in dissent echoed the same thing. The court says that the action they took was essentially adjudicatory. Granville is a little bit of a funny case because, you know, the commission – the receivership committee had been wound up for 10 years. Somebody came out of the woodwork and said, you've got $125 billion of my money. You know, the bank had it. He sued for conversion. But it's essentially the same claim. But it was the liquidation of a bankrupt trust, right? It was a liquidation of a bankrupt trust, exactly. So both claims – You know, the court appointed a commissioner and the court held that that was sovereign. Yes, but what were the acts that were sovereign? The acts that were sovereign were adjudicatory acts, acts by a receiver determining claims, dealing with an insolvent estate, and accepting some claims and rejecting others. I thought that one of the things – one of the hooks on which the judge in Granville handed on was that the acts there could not have been done by the individual citizen. That is correct. But what was the act? Again, go back to the language of the statute, the particular act or transaction. And go back to the teaching of the Supreme Court. Can the particular act or transaction can be done by a private party? In the case of both Granville and Drexel, a private party cannot assume an adjudicatory mantle and dispose of claims, override contract rights, do the kinds of things that in a claims disposition proceeding one does. And Mr. Martin and Mr. Gottlieb would say, isn't that our case? It's not our case because a private party can sue on a contract. The difference between Granville and Drexel on the one hand and this case on the other is that in those cases the receivership committees were acting as adjudicators. Here, Mr. Sinezi is acting just as a private litigant. And that is a fundamental and dispositive distinction between the two cases. Do you want to go to your third point? Then we'll have you shift from Sinezi to Mr. Loman. If I may, I'll spend just a couple of minutes on both direct effects and personal jurisdiction. Do I have the time to do that if I am very quick? Let's do direct effects first then. Okay. Direct effects, Your Honor, just to review the bidding at the end of the briefing, we said that there were three direct effects. The one was the direct effect on Judge O'Neill's order. At the end of the day, it is worthwhile to take a big picture look here and understand how this all comes up. Judge O'Neill, as I mentioned before, holds a trial, enters a judgment. This court affirms. Supreme Court denies cert. And because of the course of events I mentioned before, there's a conflicting judgment. And Judge O'Neill, considering the relative interests of the two states, answers an anti-suit injunction. That is the basis. Our claim here is for a violation for contempt of that injunction. There's a commonplace to suggest that a violation of an injunction, contempt is an affront to the issuing court, and it's the issuing court only that has the authority to address that contempt. That, we would suggest, is a direct effect on the United States. These folks are saying, we don't care what Judge O'Neill said, and that holds a direct effect right here. The parallel is with respect to the Holman-Woffenschmidt cases, which I will address when I get to personal jurisdiction. But they say, of course there's jurisdiction in the issuing court because that's where the contempt is felt. And that's where CWW is deprived of the benefit of the judgment. In the reply papers I respectfully refer you to, Mr. Snezdy and Mr. Lohman's reply papers, they essentially have no response to that. They put a third, they bury it in the back of their brief. Second direct effect. And this goes to some of the court's concerns about the Liberian receivership proceeding. This is a direct effect on a U.S. company because Mr. Snezdy is acting in a fashion that is directly contrary to the CWW's board's instructions. The CWW board takes the position that when it litigated for seven years the underlying AJA claim and won in a U.S. court, that that's the result. And it does not recognize the conflicting Liberian judgment that they are attempting to enforce in contempt of the district court. The CWW board does not take the position that a suit should be brought against ACE on an illegitimate judgment. Mr. Snezdy takes a different view. Their brief is filled with why Mr. Snezdy has the authority to do that. We don't have to resolve that. But this action takes place in the Cayman Islands against a non-U.S. company. And does it directly affect Cigna balance sheet? Well, it directly affects the prospect that the ‑‑ it directly affects in a financial way or in a governance way in two ways. One is the way I've just said. You've got a fully functioning board sitting in the Delaware corporation that says, we recognize the judgment that we spent seven years obtaining. And Mr. Snezdy is saying, no, I'm going to recognize the Liberian judgment. They're saying, we have no basis to seek indemnification against ACE. Mr. Snezdy says, oh, yes, I'm going to go get indemnification against ACE. That's thwarting the will of the CWW board. Whether or not he has a right to do it, we're on jurisdiction, right? Whether he has a right to do it, whether or not it was appropriate for him to disregard the anti‑suit injunction, we can get to that on the merits. It can be no question that that's a direct effect in the United States when the CWW board is being thwarted. The second point ‑‑ It sounds like you're depriving Cigna of the benefit of managing its own affairs. Is that what you're saying? Yes, basically. You're basically body snatching the company on very fundamental points. CWW has litigated this case for seven years. It obtained a U.S. judgment that these underlying claims that at the end of the day, Mr. Snezdy is trying to enforce were excluded by the policy. It has a right to rest on that judgment. And the court that issued not only the judgment but an injunction to protect the judgment also has a right to expect that that will be respected. Instead, Mr. Snezdy is taking activities that directly thwart that. Again, we can argue what we want in the future about whether or not that's legitimate under Liberian law, who controls. But for purposes of jurisdiction, we're just going to see whether there's a direct effect. And our suggest is that that is a direct effect in the United States, both its impact on the court and its impact on CWW as a company. And in addition, of course, the notion ‑‑ we added a third direct effect, which was the finance. As the court knows, we had two sentences on a cap. Their whole brief came in on a cap. We were wrong. They were right. But we had an entire remainder of the argument that they have not addressed, which is the notion that the recognition of a $93 million liability, as Mr. Snezdy purports to do, has no effect on the company in whose name he is purporting to recognize that liability, I would respectfully suggest, does not hold much weight. Of course there's an impact. Why don't you have five more minutes on, please? And why don't you let Mr. Lohman do it? And could I have a second on personal jurisdiction? Because you've asked me already about it. Okay, well, Mr. Lohman ‑‑ There's a rubric for both. Mr. Lohman is easy. He's a U.S. citizen. And just as, quite apart from, with respect to personal jurisdiction, the FSAA, there's no court as held. The express language of the statute excludes U.S. citizens. Of course they're excluded from the reach of the FSAA. There's no support for his position whatsoever. With respect to jurisdiction, he's a U.S. citizen. And by the way, all of the ‑‑ Look, you're a lawyer. And you are called on to be, in effect, the mouthpiece agent for a client. If the client were to get eligibility under the FSAA for immunity, why does not the agent who's that person's mouthpiece get the same? Well, for one thing, he's an individual. It doesn't cover the individual. Secondly, he's a U.S. national. And the FSAA expressly excludes U.S. nationals. The whole notion of foreign sovereign immunity extending to a U.S. national, there would be no policy purpose whatsoever for Congress to have done that. How does it expressly exclude? Well, because the statute says it excludes citizens of the United States. And it excludes citizens. That language is some of the language that suggests that the FSAA doesn't even reach individuals. But if you read it to reach individuals, you have to read it to exclude citizens of the United States. Even when they're acting as an attorney rather than a party, a commercial actor? Well, acting as an attorney in contempt of a ballot court order doesn't ‑‑ that does not itself immunize you. If you're acting in contempt, you're acting in contempt. But, I mean, the exclusion that you say is found in the express language of the statute, I would think is directed to parties in commercial transactions, not to their counsel. But he is himself acting in a commercial fashion. The fact that he's very candid in his brief. He says he was retained essentially to assist in getting around the anti‑suit injunction. He's acting in a commercial way. He's performing legal services. Whether he's ‑‑ both independently he's engaged in a commercial activity. Well, he first appears on the scene when he makes the demand prior to his employment by Mr. Sinese. He writes a letter to CWW, says these claims have now been assigned to these foreign companies. I represent those foreign companies. We don't know the full extent of the involvement. I represent those foreign companies. I make the demand for payment. Nothing happens for a year. The next thing we know, Mr. Sinese is appointed insurance commissioner. That very day he hires Mr. Lohman. And then sometime later, Mr. Sinese, acting as insurance commissioner, recognizes the claims of Mr. Lohman's, all of his former clients, as valid claims of the estate. And then Mr. Lohman, assisting Mr. Sinese, brings suit. Why doesn't the change in status from representing a commercial entity, a claimant, to representing the insurance commissioner of a nation make a big difference in that latter timeframe? Well, it certainly can't immunize the prior contempt. We suggest that the transfer of representation here is part of the aiding and abetting, which forms the basis for Judge Fulham's order. I mean, if you take a look at the sequence of events here, it should raise real concerns. We haven't had discovery yet, but it's clearly a basis for the aiding and abetting. But why does that immunize him? If he's in contempt of the order when he was assisting a private party, he's still in contempt of the order when he's assisting the commissioner. Could I take you back to your statement that the statute excludes citizens of the United States? The text of the statute says that. What section of the statute are you referring to? What's the language? I'm looking at the definition. Are you referring to 1603B? I am referring to 1603BC, an agency or instrumentality of a state. He contends that he is an agent, which is neither a citizen of state of the United States, as defined in section, et cetera, et cetera. Section what? As defined in section what? I'm sorry. As defined in section what? Well, which is a separate legal person, corporate or otherwise. Yeah, but that sort of goes back to the circuit split we had, doesn't it? Well, there is a question whether, as an individual, he can be subject to the FSAA. In this language, as some of the languages suggest, that he cannot. But if he can be, which he contends he can be, it's clear that this language excludes anybody who's a citizen of a state of the United States. As I say, I would concede that that language is some of the language that suggests that you don't even reach this question if you're dealing with an actual person. But surely there'd be no reason to exclude, to allow corporations that are citizens to be subject of individuals who are citizens. There's no reason to treat them differently. But isn't that what the text says? The text says in what fashion? Citizen is defined in 28 U.S.C. 1332C, or its reference is to 1332C, and that that pertains to corporations and legal representatives. That's true. The reference here, which is neither a citizen. But again, I think that would be an incongruity, which perhaps goes back to why individuals shouldn't be encompassed at all. If I can just do one point. We'll find that out shortly. If I may address the personal jurisdiction point. We keep trying to get to it. Nobody disputes the basic principles, and those principles are laid out in Homa and Waffen-Schmidt. Contempt is an affront to the dignity of the issue in court. Only that court can address it. Rule 65D says you can reach those who have aided and abetted. So what do you do in those circumstances? You apply basic principles of due process. And both Homa and Waffen-Schmidt say very clearly, you can assert jurisdiction over persons who've aided and abetted, even if they have no other contacts. We would suggest, before I go further, that all of the contacts that support direct effects are an independent basis for personal jurisdiction here, quite apart from this aiding and abetting rubric. But the aiding and abetting rubric, we would suggest, are just as clear. They've made two arguments to try to avoid Homa and Waffen-Schmidt. First, they try to limit Homa and Waffen-Schmidt. Homa, they say, had only to do with nationwide service or nationwide order. Homa, because he was a U.S. national. The court is being indulgent. Both of those assertions are correct. Those were fact. But they are factually correct characterizations of the cases. That's true. But if you want a statement of the holdings of the cases, I'd respectfully refer you in the case of Waffen-Schmidt to the first two sentences, which state the holding non-parties who reside outside the territorial district of the district court may be subject to that court's jurisdiction if, with actual notice of the court's order, they actively aid and abet. This is so despite the absence of other contacts with the forum. No suggestion outside the territory is limited to the U.S. And with respect to Homa, again, I won't read it since the court is being indulgent, but if you look at Note 24 where, again, they state their holding, we hold today, they state it in terms of non-parties without ever reference to the citizenship. And if you think about it, neither of those limitations can apply because they would be the only place in the entire universe of due process in which you'd suggest that a non-national who conducts activity outside the U.S. that has an impact inside the U.S. is beyond the jurisdiction of a court. Isn't there a circuit on this issue as well? Well, there isn't because this gets, if I may get to the remark. You may be right in one sense. Most assume that the individual is entitled to protection, although the Second Circuit goes the other way, right? Well, that's a slightly different point. I'm just suggesting on basic due process, the fact that you're outside the U.S. You're talking about due process? Just due process. On the outside the U.S., the fact that you're conducting outside the U.S. or you're a U.S. national, if it has an impact inside. We got that one. So you can't read Holman, Wofford, Schmidt that way. The point is you've got an individual who represents the Liberian Commissioner of Insurance in an action under the law of Liberia in a foreign jurisdiction, the Cayman Islands, against a non-American party base. I mean, doesn't it seem a bit unfair that we're going to try to drag this individual, God knows when the last time he was even in the United States, into the Eastern District of Pennsylvania? It's not remotely unfair when the very, and let's go back to the basic, what this case is about. This case is about protecting the integrity of the judgment Judge O'Neill issued  It's not remotely unfair to expect Mr. Sinese to respect the judgment. Judge O'Neill went very carefully through the balancing. He appreciated all the factors under the restatement. And that's why Reebok helps these folks not a whiff. In Reebok you had a Luxembourg bank that was in Luxembourg that tried very hard to avoid having, it even went to a Luxembourg court in order to try to avoid complying with the order. And there was a Luxembourg court judgment. To avoid a Luxembourg. But there were two critical differences between Reebok and this case. First of all, Mr. Sinese has affirmatively created the circumstances that he now says he labors under. Secondly, Luxembourg was all about protecting a Luxembourg national from doing things within Luxembourg. Mr. Sinese is acting outside of the Caymans. And that gets back to the order. What this whole argument about Reebok is really an attack on, is it is a collateral attack on Judge O'Neill's injunction, which is impermissible on contempt, let alone. We got that argument. That's your theme. Well, it has to be. I'm not disagreeing with you. But that's the thing. And we know what their theme is. It just isn't right to bring them here. So we got the picture. What we're trying to do is get the means by which we should go about deciding this subsequent to the Supreme Court decision. Well, my view is that you can decide it now, because you can decide these two acts are commercial activity on black-lit law, that the direct effects on a U.S. company and an affront to the district court clearly qualifies direct effects, and that if you follow Holman Waffen-Schmidt and distinguish Reebok on the basis I've just said. Putting yourself in our position, it would be kind of silly not to wait for three months for the Supreme Court to come down and give us some guidance with respect to at least some of these issues. Well, it would give you ‑‑ it seems to me, Your Honor, on one issue, if they come down a certain way, it gets rid of the casehold. It allows you not to reach several other issues, because if an individual is in subject, they've waived common law immunity, any reliance on that. So then it wipes out these issues. In another situation, you could affirm at this point, in my view, without having waited for the court. Thank you very much. You've been very patient, and I very much appreciate the court's courtesy. Interesting case. Mr. Martin? Are you the only one that's going to be doing rebuttal? Yes. Okay. Protecting the integrity of court judgments is an important goal. But as I said earlier, the narrow proposition in this case is that it has to be done consistent with the FSIA and the Constitution. Let me ask you, if there is immunity granted, eligibility granted for individuals under the FSIA, and ultimately there's a victory for your side for the Sinestis replacement, I guess, in the Cayman Islands, what is the effect on the judgment NOV, once upon a time entered by Judge O'Neill? Well, the ultimate effect of that will probably have to be resolved by court process at the end of the day. What's your guess as to what the effect is? Well, you know, I don't know, Your Honor. Somebody is going to come try to enforce that claim resolution and collect on it, and there probably will be proceedings at that point. But, frankly, I don't know how that's going to come out or what the legal answer to it is, because at that point you're going to have two competing valid judgments from different jurisdictions, and that's a different resolution issue than anyone has faced in this controversy up to this point. But what Mr. Donovan is, in effect, saying is you don't ever have to get to that issue if you recognize that really what this is is an end around perhaps based on discussions that took place prior to the appointment of Lohman by Sinestis with respect to Lohman's clients. This is an end around a decision given by a U.S. court 19 years ago. Your Honor, you cannot reach that conclusion on this record, and you can't do it for two independent reasons. The direct evidence that's in the record coming from the expert on Liberian law, the attorney for the receiver, and Commissioner Sensei himself completely divorces that proceeding from AJA or any involvement with AJA, the party who is the only person who can create the avenue to enforce Judge O'Neill's order. Second, it is completely transparent in this record how that came about. Commissioner Sensei was appointed by the attorney general as part of proper process, and there are orders and approvals in the Liberian court system all along the way for that with no suggestion of involvement by AJA, no indication of aid in the abetting, and no indication of any collusion of any kind. And that's what distinguishes this case from the very specific and detailed evidence that was in Homa and Waffen-Schmidt. And Homa and Waffen-Schmidt are limited because they're at the outer edges of what the Constitution provides for. And when you get away from those facts, where do you find yourself? The Riebach case, and the Riebach case covers Commissioner Sensei and Mr. Lohmann because they are acting lawfully under the laws of Liberia in another jurisdiction. And finally, on the commercial activity point, just a couple of words on that. The source of all of this activity is the receiver and the appointment of the receiver and the claim resolution process that the receiver goes through as part of the sovereign functions, just like any commissioner of insurance would do in the United States. That's what's going on here. The winding up and liquidation is part and parcel of the same claim resolution function that was considered in the cases that we cite, all of which said, that's not a private person acting like a private party in the marketplace. That's the fundamental distinction on commercial activity. Now, can they connect that to a lawsuit on a contract at the end of the day when the commissioner is acting to enforce his liquidation function? Yes, but under Saudi Arabia v. Nelson, the U.S. Supreme Court case, that connection at the end of the day to some commercial activity that a private party might be able to do doesn't obscure where all this came from. And it came from his authority as a public official, judicial administration, and his sovereign function. And that's the key to it. Thank you very much. Thank you to all counsel for very well-presented arguments. We'll take the matter under advisement, and we would ask that counsel get together with the clerk's office to order a transcript prepared of this oral argument to split the cost. Half. In other words, that side half, that side half. We'll do that, Your Honor. Thank you. Thank you very much. I call the last case of the day, Jumun Jang, Jung, number 08-4806.